UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PROGRESSIVE CASUALTY INS. CO.,
    Plaintiff,

    v.

DOMENIC MONACO, JR., SUZANNE
BURR MONACO, et al.
    Defendants.

No. 16-cv-823 (VAB)

## OPINION ON MOTION FOR SUMMARY JUDGMENT

Progressive Casualty Insurance Company ("Progressive" or "Plaintiff") seeks a

declaratory judgment against Domenic Monaco, Jr.; Suzanne Burr Monaco; EAN Holdings, LLC

("EAN"); Hunter Edward Kay; Jordans Future LLC ("Jordans"); Robert T. Dunn; and Sentinel

Insurance Company, Ltd. ("Sentinel") (collectively, "Defendants").  ECF No. 1; ECF No. 27.

Mr. Monaco and Ms. Monaco (collectively, the "Monaco Defendants") are the only Defendants

who have appeared in this case.  ECF No. 7; ECF No. 8.

This case arises out of a motor vehicle accident that occurred on February 3, 2016 in

Trumbull, Connecticut, and the resulting civil action in the Superior Court of the State of

Connecticut, which the Monaco Defendants bring against EAN, Jordans, Sentinel, Mr. Dunn,

and Mr. Kay in connection to that accident (the "Monaco Lawsuit").  Through this case,

Progressive seeks to establish whether it is liable to the Monaco Defendants for any of the claims

in the Monaco Lawsuit.

Progressive now moves for summary judgment, ECF No. 41, on all claims asserted in

their Amended Complaint, ECF No. 27.  For the reasons that follow, the Court **GRANTS**

summary judgment in favor of Progressive on all claims and finds that Progressive is not liable to the Monaco Defendants.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     The Policy

Progressive issued a commercial auto insurance policy, bearing policy number 02781455-0, to Jordans, with effective dates of November 18, 2015 to November 18, 2016 (the "Policy"). Def.'s Rule 56 Statement ¶ 1, ECF No. 53. As of February 3, 2016, the Policy identified the insured automobile as a 2016 Land Rover Range Rover HSE, bearing VIN SALGS2VF3GA269656 (the "2016 Land Rover"). *Id.* ¶ 2. By February 5, 2016, Mr. Dunn or Jordans had removed the 2016 Land Rover from the Policy. *Id.* ¶ 24. Mr. Dunn and Jordans routinely added and dropped different luxury vehicles from the Policy, which Progressive never questioned and which appeared to be permitted under the Policy. *See* Dunn Dep. 72:7-73:2, ECF No. 43-3 (testifying that "[i]f you have a good – a policy in good standing, you can add and delete as many cars as you want, whether it's Progressive, Geico, Allstate").

#### 1.     Policy Terms

The Policy with Progressive provides, in relevant part, with respect to "Part I - Liability to Others", that:

> Subject to the Limits of Liability, if **you** pay the premium for liability coverage for the insured auto involved, **we** will pay damages, other than punitive, exemplary, or statutory multiple damages, for **bodily injury** [and] **property damage** . . . for which an insured becomes legally responsible because of an **accident** arising out of the ownership, maintenance or use of that **Insured auto**.

Policy at 6, Pl.'s Rule 56 Statement Ex. 1-A, ECF No. 43-1 (emphasis in original). The Policy defines Insured Auto, in relevant part, as "[a]ny auto specifically described on the **declarations page**." *Id.* at 2. The parties do not dispute that, as of February 3, 2016, the Policy listed the

2016 Land Rover on the declarations page, as the insured automobile.  Def.'s Rule 56 Statement

¶ 2.

The Policy further provides that, for the purposes of "Part 1 – Liability to Other", in

relevant part, "Insured auto also includes . . . Any **temporary substitute auto**."  Policy at 7

(emphasis in original).  The Policy defines temporary substitute auto as follows:

> **"Temporary substitute auto"** means any **auto you** do not own while used with
> the permission of its owner as a temporary substitute for an **insured auto** that
> has been withdrawn from normal use due to breakdown, repair, servicing, loss or
> destruction.

*Id.* at 5 (emphasis in original).

## 2.     The Insured Auto

At all times relevant to this case, Mr. Dunn was a manager at Jordans.  Def.'s Rule 56

Statement ¶ 3.  Jordans acted as, among other things, a purchasing agent for customers in Asia

who were interested in purchasing luxury automobiles in the United States and shipping them

back to Asia.  *Id.*  Jordans's customers had an expectation that the luxury automobiles that

Jordans obtained in the United States on behalf of their customers would be tendered to the

customer with less than three hundred (300) miles on the vehicle, or less than five hundred (500)

miles in some instances[1].  *Id.* ¶ 4.  Within that mileage limitation, however, Mr. Dunn regularly

drove the cars that Jordan obtained for its customers for brief intervals, at his discretion.  *See*

Dunn EUO Trans. 132:5-15 ("And that [customer's] vehicle would have been used on that day in

---

[1] The Monaco Defendants dispute this fact.  *See* Def.'s Rule 56 Statement ¶ 4.  Their citations to portions of Mr. Dunn's deposition testimony, however, do not contradict this fact.  *See* Dunn EUO Trans. 159:7-160:16, ECF No. 43-2 ("It probably had – the requirement, these vehicles can't have more than 300 miles. That's the overall . . . well, sometimes they could stretch that to 500 if it already has – if it is being sold and titled as a brand new vehicle, they can go to less than 500. . . . When the final paperwork comes in and the title . . . they just want to make sure they get it and they have 300 miles.").  The record shows that Jordans and Dunn had to respect a rule that limited the amount of mileage that they could put on customers' vehicles.  *See id.*; *see also* Dunn Dep. 22:4-12, ECF No. 43-3 ("I mean, I'm authorized to drive [customer's vehicles] where I wish, but there is a threshold of mileage that I'm allowed to put on these vehicles.")

the course of my business; that's for sure."), 160:11-15 ("[I]f I really did want to pick up a car with 25 miles on it and I had it for a week and I wanted to take it, if I wanted to, I could take it anywhere I want to and use it for other business.").

There was a general expectation that, after obtaining a vehicle on behalf of a Jordans customer, Mr. Dunn would promptly "park it at 145 Canal, [and] let it sit there until conveyed to [his] customer" or at his other "office address. . . at 865 River Road . . . in Shelton." *Id.* 129:6-14. In practice, however, it appears that Mr. Dunn was able to drive the cars to run errands or in the course of conducting his day to day business or personal matters, so long as the mileage on the cars remained under three hundred miles total. *See id.* 132:5-15, 159:7-160:16; Dunn Dep. 22:4-12.

Mr. Dunn also previously had another 2016 Range Rover bearing a VIN with "the last four digits 8259" (the "8259 Range Rover"). Dunn EUO Trans. 9:2-9. That Range Rover "happened to have like a shimmy in the tires," so Mr. Dunn "wanted to get it checked out." *Id.* 10:1-11. Mr. Dunn took that vehicle to "Imported Cars of Stamford" ("Imported Cars") to have it checked out. *Id.* 10:8-11:15. Mr. Dunn's contact at Imported Cars informed Mr. Dunn that "[t]here was nothing to be concerned with," and that it was "okay," and "just might be something inherent in the vehicle." *Id.* 11:4-7.

As for the 2016 Land Rover that was identified in the Policy with Progressive, Mr. Dunn has testified that he originally thought that it, like the 8259 Range Rover, had "some type of shimmy going on in the front wheel at like 45 to 50 miles an hour," which prompted Mr. Dunn to try to get it checked out. Dunn EUO Trans. 117:2-10. Mr. Dunn further testified that the people at the shop were unable to look at the 2016 Land Rover when Mr. Dunn brought it in, and instead recommended that he go to "Enterprise" to rent a car and leave the 2016 Land Rover at

the shop until later.  *See id.* 117:12-118:7.  "[I]t was ultimately determined that there were no mechanical problems and the [2016 Land Rover] did not need any service or repairs."  *Id.* 118:8-12.  These facts are, however, disputed.  *See* Kakaletris Email, ECF No. 43-8 (explaining that Imported Cars of Stamford did not have any work orders for "the Range Rover 2016 in question" between January and March of 2016 and while Mr. Dunn had brought in a Range Rover that George Kakaletris had "told him since it was a 2016 vehicle and was under warranty to bring it to the dealer" and "[n]o work was done to the vehicle at my shop"); Dunn Dep. 20:20-21:3 ("I did have a shimmy in one of the other vehicles . . . But it wasn't this [the 2016 Land Rover] that was on the policy.").

Mr. Dunn eventually admitted that he wasn't sure which vehicle had a "shimmy" around February 2, 2016 or February 3, 2016 and would have been brought to Imported Cars.  *See* Dunn Dep. 89:10-90:6 (admitting that "I thought that it was that particular car, bearing that last four of that VIN number. I thought it was that car . . . I look back at it now and I had a lot going on that time, so, you know, I wasn't too sure").

## B.        The February 3, 2016 Accident

On or around February 2, 2016, Mr. Dunn rented a 2016 Chevrolet Tahoe (the "2016 Tahoe") from Enterprise Rent A Car ("Enterprise").  Def.'s Rule 56 Statement ¶ 7.  On his rental agreement with Enterprise, Mr. Dunn listed his employer as "Mac Daddy's" rather than Jordans.  *Id.* ¶ 8.

Also on February 2, 2016, Mr. Dunn contacted a friend, A.J. Fernandez, and asked Mr. Fernandez to be Mr. Dunn's designated driver for the day of February 3, 2016.  Def.'s Rule 56 Statement ¶ 6.  Mr. Fernandez was unable to be Mr. Dunn's driver that day, and recommended that Mr. Dunn contact Hunter Edward Kay.  *Id.* ¶ 9.  Mr. Dunn then hired Mr. Kay to be his

designated driver on February 3, 2016, paying Mr. Kay either $10.00 or $12.00 dollars an hour. *Id.*

On February 3, 2016, Mr. Kay drove Mr. Dunn in the 2016 Tahoe. Def.'s Rule 56 Statement ¶ 10. First, Mr. Kay drove Mr. Dunn and his business partner, Nick Tripoli, to a meeting in New Rochelle, New York. *Id.* After the meeting in New Rochelle, Mr. Kay then drove Mr. Dunn and Mr. Tripoli to Joseph's Steakhouse in Bridgeport, CT ("Joseph's"). *Id.* ¶ 11.

After they arrived at Joseph's at approximately 7:00 PM, the Monaco Defendants allege that there is an issue of disputed fact as to whether Mr. Dunn told Mr. Kay to stay with the 2016 Tahoe and not leave the Joseph's parking lot while Mr. Kay waited for Mr. Dunn, or whether Mr. Dunn had allowed Mr. Kay to drive elsewhere while waiting. *Id.* ¶ 12; *compare* Dunn Dep. 65:18-66:9 (stating that Mr. Dunn had informed Mr. Kay that "[m]y car and my belongings stay here" at the restaurant) *with* Kay Dep. 41:2-24, ECF No. 43-6 (showing that Mr. Kay asserted his Fifth Amendment right against self-incrimination in response to questions about whether Mr. Dunn asked him to run errands with the car including errands involving the transportation of drugs). The only evidence in the record that could potentially contradict Mr. Dunn's consistent testimony[2] that he did not give Mr. Kay permission to take the car from the Joseph's parking lot

---

[2] Outside of Mr. Kay's deposition testimony, where he asserts his Fifth Amendment right in response to all questions from Monaco Defendants' counsel surrounding his driving for Mr. Dunn, all of the remaining evidence that the Monaco Defendants cite supports Mr. Dunn's version of events. *See* Bridgeport PD Report, ECF No. 53-3 (showing that Mr. Dunn "report[ed] his driver for the day just took his rental vehicle, new black Chevy Tahoe . . . taken from in front of Joseph's Steak House" after Mr. Dunn "got a call from the Trumbull Police stating this vehicle was just involved in a motor vehicle accident in their town"); Crash Report at 11, ECF No. 53-1 (containing no indication that Mr. Kay alleged that he had permission to drive the car away from Joseph's). The Court also cannot identify any other evidence in the record that contradicts Mr. Dunn's testimony that he instructed Mr. Kay not to drive the car away from Joseph's. *See* Trumbull PD Case Report at 2-3, ECF No. 43-4 (indicating that when police officer asked Mr. Kay "did Dunn tell you not to leave the parking lot with out him in the car, Kay refused to answer and said I'm done talking to you").

is the fact that Mr. Kay invoked his Fifth Amendment privilege against self-incrimination when asked about all aspects of his interaction with Mr. Dunn, including Mr. Dunn's instructions.

Mr. Dunn and Mr. Tripoli entered Joseph's and conducted their meeting until sometimes between 9:30 p.m. and a little before 10:00 p.m. *See* Def.'s Rule 56 Statement ¶ 14; *see also* Dunn Dep. 58:20-21 ("It was very short actually. We went in at around 7:30, we were out by 9:30."); Trumbull PD Case Report at 2, ECF No. 43-4 (recording that Mr. Dunn told the officer he had "conducted the meeting until 10:00 PM"). After Mr. Dunn exited the restaurant, he saw that Mr. Kay and the 2016 Tahoe were not there, and Mr. Dunn called the Bridgeport Police to report that "his driver for the day [Mr. Kay] just took his rental vehicle, new black Chevy Tahoe . . . from in front of Joseph's Steak House." Bridgeport PD Report, ECF No. 53-3.

Regardless of what Mr. Dunn had instructed Mr. Kay, Mr. Kay drove the 2016 Tahoe away from Joseph's while Mr. Dunn and Mr. Tripoli conducted the meeting. Def.'s Rule 56 Statement ¶ 15. Mr. Kay then got into a car accident with the Monaco Defendants. *Id.* ¶ 16. The accident occurred around 8:22 p.m. *See* Crash Report at 1, ECF No. 53-1. Following the accident between the 2016 Tahoe and the Monaco Defendants' vehicle, the police reported that Mr. Kay had "the odor of an alcoholic beverage on his breath" and that Mr. Kay "admitted to taking Suboxone about an hour before the accident." *Id.* at 11. The police further reported that they found "6 Amstel Light Beer bottles, 2 Syringes with needles," and marijuana in the 2016 Tahoe. *Id.*

While investigating the accident shortly after it occurred, a Trumbull Police officer called Mr. Dunn because he was the renter on the rental agreement for the 2016 Tahoe. Trumbull PD Case Report at 1. On the phone, Mr. Dunn "stated that [Mr. Kay] had stolen the car and that he [Mr. Dunn] would come to the police station and file a report." *Id.* Mr. Dunn arrived at the

Trumbull police station around 10:30 PM and offered a sworn statement indicating that after Mr. Kay dropped him off at Joseph's, he had informed Mr. Kay that "under no circumstances do I want you to leave the lot" and that he "expect[ed] the car to be at the restaurant when I get out of the meeting." *Id.* at 2. Mr. Dunn further emphasized that "[a]t no time did I give [Mr. Kay] permission to take my car with out [sic] me in it," and that he wanted "to file charges for him stealing my car as well as my belongings" that were in the 2016 Tahoe. *Id.*

### C. The State Lawsuit

On April 13, 2016, the Monaco Defendants initiated the Monaco Lawsuit in the Superior Court of the State of Connecticut against Mr. Dunn, Mr. Kay, Jordans, EAN, and Sentinel, in connection to the February 3, 2016 accident. *See generally* Monaco Compl., ECF No. 27-1. The Monaco Lawsuit included a claim for negligence against Mr. Kay, Jordans, and Mr. Dunn; a claim for common law and statutory recklessness as to Mr. Kay; an additional claim of negligence as to Mr. Dunn and Jordans; a claim for negligence as to EAN for entrusting the 2016 Tahoe to Mr. Dunn and Jordans; and an uninsured motorist claim as to Sentinel. *Id.*

### D. Defendants' Cooperation with Progressive

In connection with the February 3, 2016 accident, Jordans and Mr. Dunn were asked by Progressive to produce various documents and records to Progressive's counsel. Def.'s Rule 56 Statement ¶ 26. On April 8, 2016, when Mr. Dunn was examined under oath, Mr. Dunn agreed to produce the following documents:

> (i) documents concerning any repairs to the 2016 Land Rover at issue in this case, (ii) warranties or service plans for the 2016 Land Rover at issue in this case, (iii) his dinner receipt from Joseph's Steakhouse, (iv) telephone records and cell phone records, (v) documents relating to any vehicles that were owned by him and/or that were in his possession, custody or control as of February 3, 2016, (vi) credit card and debit card statements, (vii) bank statements and financial statements, and (viii) documents which touch upon, concern or relate to the sale and/or transfer of any motor vehicles for the period of January 1, 2015 to the present

*Id.* ¶ 27. The record suggests that Mr. Dunn has produced very few of these documents. *See* Dunn EUO Trans. 15:14-24 ("The rental agreement. You can have an original if you want."); Dunn Dep. 24:17-25:15 (showing that Mr. Dunn had attempted to send screenshots of text messages with Mr. Kay and Mr. Fernandez). In fact, the record suggests that, despite Mr. Dunn's stated willingness to provide certain other documents, the only documents he has actually produced are screenshots of text messages with Mr. Kay and Mr. Fernandez. Def.'s Rule 56 Statement ¶ 31.

For some categories of documents, Mr. Dunn has either refused to provide them, Dunn Dep. 52:4-53:13 (indicating Mr. Dunn's refusal to provide a "fully executed cellular data records authorization form" because he had provided communications with Mr. Kay and Mr. Fernandez and did not believe that he should need to authorize access to "my communications with my daughter, my wife"), or stated that he did not possess the requested records. *Id.* 53:14-53:5 (testifying that he did not have documents touching upon his "sale of any vehicles . . . during the period of December 1, 2015 to the present" though he was "willing to provide you with all of the VIN numbers for the vehicles that I've had"). Mr. Dunn has testified that he is willing to provide various categories of documents. *See* 55:9-14 ("If you're looking for anything that I listed as far as retail purchase agreements for any of the vehicles on the Progressive policy . . . I have no issue with that. You can have copies of all those."). There is, however, no evidence in the record suggesting that Mr. Dunn has provided any documents besides the screenshots of text messages with Mr. Kay and Mr. Fernandez. Def.'s Rule 56 Statement ¶ 31.

The Policy requires any "person seeking coverage" to cooperate with Progressive in various ways "in the event of an accident or loss." Policy at 1. These requirements include that the "person seeking coverage" must, in relevant part: "cooperate with [Progressive] in any matter

concerning a claim or lawsuit"; "authorize [Progressive] to obtain medical and other records"; and "authorize [Progressive] access to **your** business or personal records as often as we may reasonably require." *Id.* (emphasis in original). The parties dispute whether the requirement that the "person seeking coverage . . . allow [Progressive] to take signed and recorded statements, including sworn statements and examinations under oath . . . and answer all reasonable questions we may ask as often as [Progressive] may reasonably require," *id.*, is a requirement that Mr. Dunn, as the person seeking coverage, "sign a Jurat form, through which he would certify under oath that his testimony, including any corrections he made on a transcript correction page, were true and accurate." Def.'s Rule 56 Statement ¶ 29.

The parties do not dispute that Mr. Kay has failed to comply with Progressive's requests that he appear for an examination under oath or that he produce documents. Def.'s Rule 56 Statement ¶¶ 33-34. Nor has Mr. Kay cooperated with the subpoena, notice of deposition, re-notice of deposition, and document requests that Progressive served on him in connection with this case. *Id.* ¶ 35. The parties also do not dispute that Mr. Kay has asserted his Fifth Amendment privilege against self-incrimination as a justification for refusing to produce documents or provide any substantive responses to questions when he was deposed on September 16, 2016. *Id.* ¶¶ 36-37.

## II.     STANDARD OF REVIEW

The Court will grant a motion for summary judgment if it determines that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that no genuine dispute of material fact exists. *See, e.g.*, *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 133 (2d Cir. 2000). Once the moving party has satisfied that burden, the nonmoving party "must set forth specific

facts demonstrating that there is a genuine issue for trial" in order to defeat the motion for summary judgment. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (internal quotation marks omitted). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. Of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quoting *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir. 1998)). The substantive law governing the case identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

On summary judgment, the court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). When reviewing the record on a motion for summary judgment, the Court must "assess the record in the light most favorable to the non-movant" and "draw all reasonable inferences in the non-movant's favor." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (internal quotation marks omitted). Inferences drawn in favor of the nonmovant must, however, be supported by evidence, and the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" is insufficient to defeat summary judgment. *Liberty Lobby*, 477 U.S. at 252.

"Conclusory allegations, conjecture, and speculation" are insufficient to create genuine issues of material fact. *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (internal quotation marks omitted). If no reasonable jury "could find in favor of the [nonmovant] because

the evidence to support its case is so slight, there is no genuine issue of material fact," then a grant of summary judgment is proper. *Gallo*, 22 F.3d at 1224.

Under Connecticut law the "[c]onstruction of a contract of insurance presents a question of law for the court." *Hartford Cas. Ins. Co. v. Litchfield Mut. Fire Ins. Co.*, 274 Conn. 457, 462-63 (2005) (internal quotation marks omitted). "Substantively, under Connecticut law, an insurance policy is to be interpreted by the same general rules that govern the construction of any written contract." *Arrowood Indem. Co. v. King*, 699 F.3d 735, 739 (2d Cir. 2012) (citing *Conn. Med. Ins. Co. v. Kulikowski*, 286 Conn. 1, 5, 942 A.2d 334, 338 (2008)) (internal quotation marks omitted). "If the terms of the policy are clear and unambiguous, then the contract language must be accorded its natural and ordinary meaning," and courts "will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity." *Id.* at 739-40 (citing *Schilberg Integrated Metals Corp. v. Cont'l Cas. Co.*, 263 Conn. 245, 267 (2003) (internal quotation marks omitted). Furthermore, "any ambiguity in a contract must emanate from the language used in the contract." *Id.* at 740 (internal quotation marks omitted). "It is the function of the court to construe the provisions of the insurance contract and, if no material facts are at issue, the question of whether coverage exists is a question of law that is appropriately decided on a motion for summary judgment." *Peerless Ins. Co. v. Disla*, 999 F. Supp. 261, 263 (D. Conn. 1998)

## III. DISCUSSION

Progressive moves for summary judgment in its favor on all claims asserted in its Amended Complaint, ECF No. 27. Specifically, Progressive's Amended Complaint alleges that: (1) Mr. Kay breached the duties in the event of an accident or loss provision of the Policy and therefore is not covered under the Policy, Amend. Compl. ¶ 47; (2) to the extent the Monaco

Defendants seek to recover punitive or exemplary damages from Mr. Kay in the Monaco

Lawsuit, Progressive has no duty to indemnify Mr. Kay for such damages under the Policy

because the Policy specifically provides that Progressive is not liable for punitive or exemplary

damages, *id.* ¶ 48; and (3) the Policy does not cover Mr. Kay, Jordans, or Mr. Dunn as to the

Monaco Defendants' claims in the Monaco Suit, and Progressive does not therefore owe a duty

to defend or indemnify Mr. Kay, Jordans, or Mr. Dunn in the Monaco Lawsuit, *id.* ¶¶ 49-50.

Progressive's Amended Complaint seeks declaratory judgment as to all of these issues. *Id.* ¶ 53.

Progressive's motion for summary judgment advances four arguments as to how it is not

liable for the Monaco Defendants' claims arising from the February 3, 2016 accident, which they

bring in the Monaco Lawsuit in Connecticut state court. *See* Pl.'s Motion at 1-2, ECF No. 41.

Specifically, Progressive argues that (1) the 2016 Tahoe was not an insured auto covered by the

Policy; (2) even if the 2016 Tahoe was covered by the Policy, that Mr. Kay did not have Mr.

Dunn's, the policyholder's, permission to drive the vehicle at the time of the accident; (3) that

coverage under the Policy is barred due to Mr. Kay's and Mr. Dunn's failure to comply with the

insured's duties in the event of accident or loss; and (4) that there is no coverage for punitive,

exemplary, or statutory multiple damages, which the Monaco Defendants seek in the Monaco

Lawsuit, under the Policy regardless. *See id.* As explained below, the Court finds that it need

only consider the first two theories, which allow summary judgment in Progressive's favor as to

all claims in the Amended Complaint, as this analysis establishes that Progressive is not liable

for any of the Monaco Defendants' claims in the Monaco Lawsuit.

## A.      **Withdrawn from Use**

The parties do not dispute that the car listed on the Policy was the 2016 Land Rover,

which was not the vehicle involved in the February 3, 2016 accident. *See* Def.'s Rule 56

Statement ¶ 2.  The parties dispute whether the 2016 Tahoe, the vehicle involved in the accident with the Monaco Defendants, is covered by the Policy with Progressive.  The parties appear to agree that the only provision of the Policy through which the 2016 Tahoe could be covered is the provision providing that an "Insured auto" under the policy "includes . . . [a]ny temporary substitute auto," Policy at 7 (emphasis removed), which means "any auto you do not own while used with the permission of its owner as a temporary substitute for an insured auto that has been withdrawn from normal use due to breakdown, repair, servicing, loss or destruction." *id.* at 5 (emphasis removed); *see also* Def.'s Br. at 2-3 (arguing that the 2016 Tahoe was a temporary substitute auto); Pl.'s Br. at 12-19 (arguing that the 2016 Tahoe was not a temporary substitute auto).

Courts have found, in cases involving automobile insurance policies similar to the one at issue here, that to the extent that the policyholder did not rent a vehicle "because another automobile insured by [the policy at issue] was out of use for servicing or repair or because of breakdown, loss, or destruction," the rental vehicle will not be a substitute vehicle covered by the policy. *Metro. Prop. & Cas. Ins. Co. v. Murray*, No. 3:10-CV-356 (SRU), 2011 WL 5238861, at *1 (D. Conn. Nov. 1, 2011) (granting summary judgment in favor of insurance company where policyholder admitted the rental vehicle was not rented because a covered vehicle was out of use for servicing or repair or because of breakdown, loss, or destruction); *see also Perry v. Safeco Ins. Co.*, No. CV066000295S, 2009 WL 3838913, at *2 (Conn. Super. Ct. Oct. 15, 2009) (finding that the listed vehicle must be "out of use" for "reasons enumerated in the policy" in order for a car to qualify as a "temporary substitute car").

If there is no factual dispute that "the vehicles listed in the policy were all operational and in working order, a vehicle not listed in the policy cannot be a "temporary substitute auto."

14

*Collins v. Progressive Nw. Ins. Co.*, No. HHDCV146050583, 2015 WL 7421571, at \*2-3 (Conn. Super. Ct. Oct. 27, 2015) (discussing another Progressive policy essentially identical to one at issue here in defining "a 'temporary substitute auto' in relevant part as 'any auto used, with the permission of its owner, as a substitute for an insured auto that has been withdrawn from normal use due to a breakdown, repair, servicing, loss or destruction'")

The parties dispute whether the 2016 Land Rover listed as the vehicle covered by the Policy was "withdrawn from normal use due to breakdown, repair, servicing, loss or destruction." Policy at 5. Mr. Dunn's testimony as to the 2016 Land Rover and the 8259 Range Rover suggests that he was not sure which of the two had a "shimmy" around February 2, 2016 that caused him to bring the vehicle at issue to Imported Cars in Stamford. *See* Dunn Dep. 89:10-90:6. Regardless of which vehicle Mr. Dunn brought to Imported Cars around February 2, 2016, there is no evidence in the record that either of these cars had been "withdrawn from normal use due to breakdown, repair, servicing, loss or destruction." Mr. Dunn testified that one or both of these cars had "happened to have like a shimmy in the tires," but that Imported Cars had informed him that "[t]here was nothing to be concerned with" and that the car was "okay." Dunn EUO Trans. 10:8-11:7. The only other relevant evidence in the record is Mr. Kakaletris's e-mail, establishing that one of either the 2016 Land Rover or the 8259 Range Rover had been brought in to Imported Cars between January and March of 2016, noting to Mr. Dunn that "[n]o work was done to the vehicle" at Imported Vehicles. Kakaletris E-mail.

In the absence of evidence establishing that Mr. Dunn rented the 2016 Tahoe to replace the 2016 Land Rover, because it was not in working order, the Policy cannot cover the 2016 Tahoe as a temporary substitute auto. *See Collins*, 2015 WL 7421571 at \*2-3. The evidence in the record suggests that neither the 2016 Land Rover nor the 8259 Range Rover were ever out of

use, but, as explained above, the record is also too muddled to establish for a certainty which of the vehicles was brought to Imported Cars, and when. To the extent that Progressive, as the moving party, has the burden of showing that no genuine dispute of material fact exists, *see Carlton*, 202 F.3d at 133, the Court does not grant summary judgment on Progressive's liability on the issue of whether the 2016 Land Rover had been "withdrawn from normal use due to breakdown, repair, servicing, loss or destruction," Policy at 5, which is a precondition to the 2016 Tahoe being a temporary substitute auto covered by the Policy. Because the record cannot clearly establish that the 2016 Land Rover was operational at the time Mr. Dunn rented the 2016 Tahoe, summary judgment based on whether the vehicle had been withdrawn from normal use is inappropriate. As explained below, however, the Court can grant summary judgment on the permission of the owner provision of the temporary substitute auto definition in the Policy.

### B.  Permission of its Owner

The Policy further provides that any temporary substitute auto must be "used with the permission of its owner" in order to be a temporary substitute auto that is covered by the Policy. Policy at 5 (defining "temporary substitute auto"). As explained below, there is no admissible evidence in the record to contradict Mr. Dunn's consistent testimony that he did not give Mr. Kay permission to drive the 2016 Tahoe away from Joseph's Steakhouse. Thus, there is no genuine dispute of material fact as to Mr. Kay's lack of permission to drive the 2016 Tahoe at the time of the accident, and Progressive is therefore not liable to the Monaco Defendants for any of the claims in the Monaco Lawsuit. *See Murray*, 2011 WL 5238861 at *4 (explaining that it is proper for the district court to grant summary judgment on the insurance company's liability despite pending state action concerning the underlying car accident.

### 1. Admissibility of Evidence

In opposing Progressive's motion for summary judgment, the Monaco Defendants primarily rely on evidence that may not be admissible at trial. *See* Def.'s Rule 56 Statement at 26-29. This evidence falls into two general categories. First, there is evidence of Mr. Dunn's past bad acts that, even if admitted, could only be used for impeachment purposes to undermine the credibility of his testimony, including evidence of alcohol and marijuana use, a past court martial and discharge from the United States Air Force for marijuana use and distribution, a past possession of a controlled substance conviction, and a past conviction for issuing a bad check over $1,000. *Id.* at 28-29. Second, the Monaco Defendants also ask the Court to draw various negative inferences as to Progressive and Mr. Dunn from Mr. Kay's assertion of the Fifth Amendment privilege, including by asking the Court to infer that "[Mr. Dunn] asked [Mr. Kay] to use the 2016 Tahoe to run errands on [Mr. Dunn's] behalf which include[d] obtaining and/or transporting alcohol, marijuana, and other illegal drugs." *Id.* at 26.

"[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997). While disputes as to the validity and weight of the evidence are for the jury, "questions of admissibility are properly resolved by the court." *Id.* Evidence that "could be admitted at trial only for impeachment purposes . . . cannot itself be used to support [a party's] case at the summary judgment stage." *Santos v. Murdock*, 243 F.3d 681, 684 (2d Cir. 2001). When deciding a summary judgment motion, the Court "has broad discretion in choosing whether to admit evidence." *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009).

The rules governing admissibility of evidence are the same at the summary judgment stage as they are during trial. *See id.* ("The principles governing admissibility of evidence do not change on a motion for summary judgment.") (quoting *Raskin*, 125 F.3d at 65-66). Indeed, "[t]he resolution of evidentiary questions on summary judgment conserves the resources of the parties, the court, and the jury." *Raskin*, 125 F.3d at 66.

If a party opposing summary judgment points only to evidence that could discredit a key witness's testimony, but does not present other evidence that actually contradicts the testimony at issue, the nonmovant will not be able to survive summary judgment solely by impeaching the witness. *See Fernandez v. China Ocean Shipping, (Grp.) Co.*, 312 F. Supp. 2d 369, 378 (E.D.N.Y. 2003), *aff'd*, 94 F. App'x 866 (2d Cir. 2004) ("Merely to assert that a witness may be lying, without any evidence to contradict the witnesses' testimony cannot defeat a motion for summary judgment."); *Marks v. Nat'l Commc'ns Ass'n, Inc.*, 72 F. Supp. 2d 322, 333 (S.D.N.Y. 1999) ("[T]he nonmovant cannot survive summary judgment simply by asserting that a potential witness's credibility is at issue. Rather, to 'put credibility in issue so as to preclude summary judgment,' the nonmovant must produce 'specific facts' that demonstrate an actual inconsistency.")

### a. Impeachment Evidence

"Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b). Furthermore, the "probative value" of such evidence may be "substantially outweighed by a danger of . . . unfair prejudice," providing another reason to exclude such evidence. Fed. R. Evid. 403.

Under Rule 609(a)(1), parties may also "attack[] a witness's character for truthfulness by evidence of a criminal conviction," provided that the conviction was "for a crime that, in the convicting jurisdiction, was punishable by . . . imprisonment for more than one year," in which case, such evidence "must be admitted, subject to Rule 403, in a civil case." Fed. R. Evid. 609(a). The Second Circuit has held that "prior convictions should not be admitted unless the court has carefully conducted the Rule 403 balancing test" by weighing the probative value of prior convictions against the danger of unfair prejudice. *United States v. McCallum*, 584 F.3d 471, 476 (2d Cir. 2009). "[T]rial judges have broad discretion in making" admissibility determinations under Rule 609, and the "prime factor to be considered is the probative value of the prior conviction as to the witness' truthfulness." *Nibbs v. Goulart*, 822 F. Supp. 2d 339, 343 (S.D.N.Y. 2011) (discussing evidence of false arrest case plaintiff's prior drug convictions); *see also United States v. Ortiz*, 553 F.2d 782, 784 (2d Cir. 1977) ("[Rule 609(a)(1)] gives broad discretion to the trial judge and its exercise should not be disturbed absent a clear showing of abuse. In the exercise of this discretion, many factors are relevant. Prime among them is whether the crime, by its nature, is probative of a lack of veracity.").

Under Rule 609(a)(2), if the court can "readily determine that establishing the elements of the crime required proving – or the witness's admitting – a dishonest act or false statement," then "the evidence must be admitted." Fed. R. Evid. 609(a)(2). Under Rule 609(a)(2), the Court must admit the evidence of Mr. Dunn's 2009 conviction for writing a bad check. *See* Fed. R. Evid. 609(a)(2) (providing that if the court can "readily determine that establishing the elements of the crime required proving – or the witness's admitting – a dishonest act or false statement," then "the evidence must be admitted"); *see also United States v. Bumagin*, 136 F. Supp. 3d 361, 377 (E.D.N.Y. 2015) (finding that a conviction for passing a counterfeit check under federal law

was *per se* admissible under Rule 609(a)(2)); *United States v. Mesbahuddin*, No. 10-CR-726 (NGG) (JO), 2011 WL 3841385, at *2 (E.D.N.Y. Aug. 26, 2011) (same). Evidence admitted under Rule 609, however, is solely for impeachment purposes, to "attack[] a witness's character for truthfulness," Fed R. Evid. 609(a), and it cannot, by itself, support a party's case at summary judgment. *See Santos*, 243 F.3d at 684.

As explained above, the evidence of Mr. Dunn's use of alcohol or drugs on February 3, 2016, his past involvement with drug possession or distribution, and his past conviction for writing a bad check can, even if admitted, only be used for impeachment purposes. Such evidence alone, in the absence of other evidence that contradicts Mr. Dunn's testimony, cannot create a genuine issue of material fact that would allow the Monaco Defendants to survive Progressive's motion for summary judgment. *See Fernandez*, 312 F. Supp. 2d at 378; *Marks*, 72 F. Supp. 2d at 333. Thus, the Court cannot rely on any of this potential impeachment evidence as a sole basis to deny Progressive's motion for summary judgment.

### b.      Assertion of Fifth Amendment Privilege

Both Progressive and the Monaco Defendants agree that Mr. Kay's asserting his Fifth Amendment right to remain silent as to all questions regarding his arrangement with Mr. Dunn on February 3, 2016 should be admitted, and that the Court should draw adverse inferences against Mr. Kay from his pleading the Fifth. *See* Pl.'s Br. at 10-12; Def.'s Br. at 2. The parties disagree, however, as to what specific negative inferences the Court should draw from Mr. Kay's having asserted his Fifth Amendment rights. Progressive asks the Court to infer only that Mr. Kay took the 2016 Tahoe without Mr. Dunn's permission. *See* Pl.'s Br. at 10-12. The Monaco Defendants ask the Court to infer that Mr. Dunn directed Mr. Kay to run errands involving the

transportation of drugs with the 2016 Tahoe, while Mr. Dunn was in his meeting at Joseph's Steakhouse.  *See* Def.'s Rule 56 Statement ¶ 11.

There is a "prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) (allowing adverse inference to be drawn against state prison inmates that refused to testify in prison disciplinary proceedings).  The Second Circuit has also held that a nonparty witness's assertion of the Fifth Amendment privilege may be admitted against a party, though it requires a case by case determination.  *See Brink's Inc. v. City of N.Y.*, 717 F.2d 700, 710 (2d Cir. 1983) ("Overall we are inclined to agree with [the district court] that the employees' claims of privilege were admissible and competent evidence under the circumstances of this case."); *see also LiButti v. United States*, 107 F.3d 110, 121 (2d Cir. 1997) ("Accordingly, as in *Brinks*, the circumstances of a given case, rather than the status of a particular non-party witness, is the admissibility determinant.").

The Second Circuit has set forth several factors for district courts to consider before admitting evidence of a nonparty witness's assertion of the Fifth Amendment privilege "and the concomitant drawing of adverse inferences." *LiButti*, 107 F.3d at 123.  The "overarching concern" in this inquiry is "fundamentally whether the adverse inference is trustworthy under all the circumstances and will advance the search for the truth." *Id.* at 124.

The first factor is the nature of the relevant relationship between the non-party witness and the party, "invariably the most significant circumstance," which the court examines "from the perspective of a non-party witness' loyalty to the plaintiff or defendant . . . [t]he closer the

bond, whether by reason of blood, friendship or business, the less likely the non-party witness would be to render testimony in order to damage the relationship." *Id.* at 123.

The second factor is the degree of control of the party over the non-party witness, as the "degree of control which the party has vested in the non-party witness in regard to the key facts and general subject matter of the limitation will likely inform the trial court whether the assertion of the privilege should be viewed as akin to testimony approaching admissibility . . . as a vicarious admission." *Id.*

The third factor is the compatibility of the interests of the party and non-party witness in the outcome of the litigation, in that the "trial court should evaluate whether the non-party witness is pragmatically a noncaptioned party in interest and whether the assertion of the privilege advances the interests of both the non-party witness and the affected party." *Id.*

The fourth factor is the role of the non-party witness in the litigation, namely whether the witness "was a key figure in the litigation and played a controlling role in respect to any of its underlying aspects." *Id.* at 123-24. Where the nonparty witness was the relevant party's father and the two "had precisely the same interest against the drawing of adverse inferences" from the witness's invocation of the Fifth Amendment, the Second Circuit found that "the circumstances of this case compel the admissibility" of the nonparty' witness's pleading the Fifth. *Id.* at 124.

Under the factors set forth by the Second Circuit in *Libutti*, it would not be proper for the Court to admit evidence of Mr. Kay having asserted his Fifth Amendment right for the purpose of supporting a negative inference against Mr. Dunn: that Mr. Dunn gave Mr. Kay permission to drive the 2016 Tahoe away from Joseph's or that Mr. Dunn directed Mr. Kay to run errands involving the alleged transportation of drugs. Although, on February 3, 2016, Mr. Dunn hired Mr. Kay to drive the 2016 Tahoe, it cannot be inferred that Mr. Dunn had a "degree of control"

over Mr. Kay to the extent of Mr. Kay having an incentive to testify in a way that protects Mr.

Dunn's interests with regards to the February 3, 2016 accident. *LiButti*, 107 F.3d at 123.

Instead, Mr. Kay's and Mr. Dunn's positions regarding the circumstances leading to the accident

are fundamentally incompatible, as Mr. Kay would have every incentive to argue that he did not

steal the 2016 Tahoe, were he not asserting his Fifth Amendment right, while Mr. Dunn

maintains that Mr. Kay stole the vehicle. Nor does Mr. Kay's assertion of his Fifth Amendment

right "advance[] the interests of both [himself] and [Mr. Dunn or Progressive]." *Id.* Mr. Kay's

interests are, again, entirely incompatible with those of Progressive and Mr. Dunn.

Unlike the witness and party in *Libutti*, Mr. Kay and Mr. Dunn do not have "precisely the

same interest against the drawing of adverse inferences" from Mr. Kay's invocation of the Fifth

Amendment, indeed, Mr. Dunn had reported Mr. Kay for stealing the 2016 Tahoe. *LiButti*, 107

F.3d at 124. There is no reason for the Court to find that the drawing of an adverse inference

against Mr. Dunn and Progressive from Mr. Kay's assertion of the Fifth Amendment right would

be "trustworthy under all the circumstances" in this case and "advance the search for the truth."

*Id.* Thus, the Court would not admit evidence of Mr. Kay's asserting his Fifth Amendment right

in order to support an inference that Mr. Dunn gave Mr. Kay permission to drive the 2016 Tahoe

away from Joseph's, much less that Mr. Dunn directed Mr. Kay to transport drugs. There is,

therefore, no evidence in the record to contradict Mr. Dunn's testimony that he did not give Mr.

Kay permission to drive the 2016 Tahoe away from Joseph's while Mr. Dunn had his meeting.

### 2. Express or Implied Permission

Courts have generally found that provisions regarding permission to drive a vehicle under

insurance policies such as the one at issue in this case generally "do[] not limit such permission

to that which is expressed and specific," such that "permission may be 'implied from a course of

conduct known to and acquiesced in by the named insured.'" *Metro. Prop. & Cas. Ins. Co. v. Espach*, 313 F. Supp. 2d 109, 113 (D. Conn. 2004) (citing *Tomasetti v. Maryland Casualty Co.*, 117 Conn. 505, 507 (Conn.1933)). "Implied permission may be found where there is a course of conduct consisting of a prolonged, frequent, and habitual use of the subject vehicle where the owner was with knowledge and acquiescence." *Id.* (internal quotation marks omitted).

Under Connecticut law, many factors are relevant to "the determination of whether any belief that the defendant may have had, that he was entitled to drive the vehicle, was reasonable." *Nicholas v. Amica Mut. Ins. Co.*, No. CV94047942, 2002 WL 845697, at *7 (Conn. Super. Ct. Apr. 4, 2002). These factors include (1) "whether the driver had express permission to use the vehicle"; (2) "whether the driver's use of the vehicle exceeded the permission granted"; (3) "whether the driver was 'legally' entitled to drive under the laws of the applicable state"; (4) "whether the driver had any ownership or possessory right to the vehicle"; and (5) "whether there was some form of relationship between the driver and the insured, or one authorized to act on behalf of the insured, that would have caused the driver to believe he was entitled to drive the vehicle." *Id.*

The only admissible evidence in the record is Mr. Dunn's consistent testimony that he did not give Mr. Kay permission to drive the 2016 Tahoe away from Joseph's Steakhouse. While the Monaco Defendants point to other possible evidence, as explained above, much of this evidence is admissible only to impeach Mr. Dunn's credibility, and in the absence of any actual "evidence to contradict the witnesses' testimony," impeachment of a witness's credibility alone "cannot defeat a motion for summary judgment." *Fernandez*, 312 F. Supp. 2d at 378. In other words, the Monaco Defendants fail to "produce specific facts that demonstrate an actual inconsistency" with Mr. Dunn's testimony. *Marks*, 72 F. Supp. 2d at 333. As discussed above

with respect to Mr. Kay's assertion of his Fifth Amendment privilege, the Court cannot admit that evidence and allow negative inferences to be drawn against Mr. Dunn, suggesting that Mr. Dunn directed Mr. Kay to use the 2016 Tahoe to run errands involving the transportation of drugs, as that would not be "trustworthy under all the circumstances" in this case or "advance the search for the truth." *LiButti*, 107 F.3d at 124.

The Court therefore finds that the admissible evidence in the record shows that there is no genuine issue of material fact as to whether Mr. Kay had Mr. Dunn's permission at the time of the February 3, 2016 accident, as required under the Policy for the 2016 Tahoe to be a temporary substitute auto. As a result, no reasonable jury could find that Mr. Kay's use of the vehicle was permitted in light of Mr. Dunn's explicit instruction that Mr. Kay stay in the Joseph's Steakhouse parking lot. *See Nicholas*, 2002 WL 845697 at *7 (finding that there was no issue of material fact as to auto insurer's liability where a driver had been operating the insured vehicle without a reasonable belief that he was entitled to do so). Thus, as a matter of law, Progressive is not liable to the Monaco Defendants for the claims they bring in the Monaco lawsuit and Progressive is entitled to summary judgment.

IV.     **CONCLUSION**

For the foregoing reasons, the Court **GRANTS** summary judgment in favor of Progressive on all claims and finds that Progressive is not liable to the Monaco Defendants for any of the claims in the Monaco Lawsuit.

The Clerk of the Court is directed to enter judgment in favor of Progressive.

SO ORDERED at Bridgeport, Connecticut, this 5th day of July, 2017.

　　　　　　　　　　　　　　　　　　　_/s/ Victor A. Bolden_____
　　　　　　　　　　　　　　　　　　　Victor A. Bolden
　　　　　　　　　　　　　　　　　　　United States District Judge